UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TUSCANY SOUTH AMERICA LTD., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-1309 |
| | § | |
| PENTAGON FREIGHT SYSTEMS, INC., *et al*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court is Defendant's ("Pentagon") Motion for Partial Summary Judgment (Doc. 48), Plaintiff's ("Tuscany") Response (Doc. 54), and Defendant's Reply (Doc. 55). Also before the Court is Defendant's Supplement to Motion for Partial Summary Judgment (Doc. 59), Response (Doc. 62), Reply (Doc. 63), and Response to Reply (Doc. 64). After considering the motion and supplement, the responses, the replies, the facts of this case, and the applicable law, the Court finds that Defendant's motion for partial summary judgment should be granted.

## I.   Background

This is a dispute over the loss of oilfield equipment intended to be shipped from the United States to Guyana via Brazil. Doc. 3 at 1.  On June 1, 2010, Tuscany contracted with Pentagon to provide freight forwarding services for the cargo, including customs clearance in Brazil. Doc. 48 at 6; Doc. 54 at 7.   On June 20, 2010, the Brazilian customs authority detained the cargo due to inconsistent documentation. Doc. 3 at 8. The customs authority later released part of the cargo and sold the remainder at auction. *Id.* Tuscany seeks $9,639,314[1] in actual

---

[1] Tuscany's original complaint and first amended complaint assert $9,639,314 in damages. Doc. 1 at 9; Doc. 3 at 9.

damages, plus incidental damages, interest, costs, and fees. *Id.*, 9. Pentagon seeks a ruling on summary judgment that Tuscany's damages are limited by the Terms and Conditions of Service promulgated by the National Customs Brokers and Forwarders Association of America, Inc. ("NCBFAA") (revision of 07/08) ("Terms"), which limit Tuscany's damages to $100 per shipment. Doc. 73-1 at 3 ¶ 9(c). Tuscany admits the contract involved two shipments, bringing the limit to $200. Doc. 48 at 10. Pentagon also seeks summary judgment on Tuscany's negligence and breach of warranty claims under the economic loss rule. Tuscany admits the rule applies to its negligence and implied breach of warranty claims but not to its express warranty claim. Doc. 62 at 8.

## II.      Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Initially the moving party bears the burden of identifying evidence that no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the burden of proof at trial, the movant need only point to the absence of evidence supporting an essential element of the nonmovant's case; it does not have to support its motion with evidence negating the case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmovant then can defeat the motion for summary judgment only by identifying specific evidence of a genuine issue of material fact, *Anderson*, 477 U.S. at 248-49.

---

Tuscany's response to the Motion for Partial Summary Judgment states a reduced amount of $6,006,210.91. Doc. 54 at 2.

III.    **Discussion**

A.    **Limitation of Liability**

The parties disagree as to whether the Terms were incorporated into Pentagon's contract to provide freight forwarding services to Tuscany. A sentence referring to the Terms occurs in the signature block of an email message sent June 1, 2010 by Pentagon to Tuscany confirming their oral agreement ("All business is undertaken subject to the [Terms]."). Doc. 48-11 at 19. During discussions leading up to the agreement, Pentagon sent 16 emails with the reference to the Terms. Doc. 48 at 6. At least 13 emails with the reference to the Terms were sent after the agreement and before the cargo was shipped. Doc. 48 at 8. In addition, Tuscany signed a customs form (Doc. 48-12 at 4) which included at the bottom of the page a reference to the Terms and paid three invoices totaling $2,692,219.50 attached to emails including a reference to the Terms. Doc. 48-18. Tuscany claims it did not consider the references part of its contract with Pentagon. Doc. 54 at 7.

In *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, the Fifth Circuit held, under maritime law, terms available on a ship owner's website were incorporated into a contract for repairs when the contractor received a Repair Service Order confirming an oral agreement with the following notice prominently displayed on the first page: "THIS RSO IS ISSUED IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW.CROWLEY.COM / DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING." 648 F.3d 258, 263 (5th Cir. 2011). The court explained its holding on grounds that under both general contract and admiralty law a contract will incorporate terms from another document by reference when (1) a particular document is described in such terms that its identity may be ascertained beyond doubt, (2) the parties had reasonable notice of the terms, and (3) the

parties manifested assent to the terms. *Id.* at 267-68 (citing 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 1999)).

Here, it is undisputed Pentagon made references to Terms that are located in a particular document, the Terms and Conditions of Service promulgated by the National Customs Brokers and Forwarders Association of America, Inc. (revision of 07/08). The parties disagree as to whether Tuscany had reasonable notice and manifested assent to the Terms. In regard to reasonable notice, Tuscany was never given a copy of the Terms, but Pentagon asserts they were "at all pertinent times reasonably accessible and available to Tuscany on the Internet website of the National Customs Brokers and Forwarders Association of America, Inc. with the 07/08 revision." Doc. 48 at 14. Pentagon relies on the declaration of its employee, Bertha Vincent:

> I have confirmed with the National Customs Brokers and Forwarders Association of America, Inc., that the NCBFAA terms rev. 07/08 were accessible on their website at all times during Apri1 2010 through July 2010. The NCBFAA terms rev. 07/08 were still up and available on the NCBFAA website in 2014 when I checked recently.

Doc 48-6, ¶ 8.[2] This statement is hearsay. Fed. R. Evid. 802.

In *One Beacon*, the court held there was reasonable notice of the terms at issue, even though they were not accessible as provided on the service order by typing "www.crowley.com / documents & forms" but required navigating with three mouse clicks from a homepage, as demonstrated at trial. 648 F.3d at 263. The court concluded, "Although Crowley undoubtedly

---

[2] The current NCBFAA website does not include the Terms but includes a 2013 revision which leaves the amount of liability blank. NCBFAA Terms and Conditions of Service (Revised 02/13), ¶ 9(c), *available at* http://www.ncbfaa.org (follow "Publications & Resources"; then follow "NCBFAA Terms and Conditions of Service") (last visited Sept. 19, 2014) ("In the absence of additional coverage under (b) above, the Company's liability shall be limited to the following: (i) where the claim arises from activities other than those relating to customs business, $ per shipment or transaction, or <<Insert applicable amount>>"). The NCBFAA website also includes a notice that a $50 limit was removed in 2009. *Id.* ("NCBFAA Guidelines for Using the Revised Terms & Conditions of Service . . . . 07/21/2009 Article 9 deals with limitations of liability, and members need to establish the extent to which, if any, they may wish to limit their liability. There being no applicable statute mandating any particular figure, members can elect to insert any figure (higher or lower) they believe is reasonable without regard to the $50 limitation that had existed in the old form.").

could have provided clearer directions to the location of the terms and conditions on the website, we agree with the district court that notice of the terms and conditions was reasonable under the particular facts of this case." *Id.* at 270. The court, however, qualified its holding: "We can imagine situations involving online terms and conditions where, analogous to [*Orduna S.A. v. Zen-Noh Grain Corp.*] . . . there was insufficient notice of the location of the terms and conditions such that a reasonable person would not be expected to find them." *Id.* at 269 (citing 913 F.2d 1149 (5th Cir. 1990)). In *Orduna,* the court held a shipping agent was not bound to terms in a separate document when it signed a berth application stating it was "in compliance with and subject to all applicable tariffs" but claimed never to have received a copy of the tariff at issue. The opposing party testified it had sent the tariff to local shipping agents and the local port authority. The court upheld the trial court's finding that the agent never received or consented to the tariff. *Orduna*, 913 F.2d at 1153-54 (5th Cir. 1990). The *One Beacon* court distinguished *Orduna* as follows:

> [U]nlike in *Orduna*, [the contractor] had access to the terms and conditions, which were at all times available to [the contractor] on [the shipowner's] website. It is undisputed that neither the content nor the location of the terms and conditions changed during the relevant time period. The district court found that [the shipowner's] website was easily navigated, and that a reasonable person would have been able to find the terms and conditions, findings that [the contractor] does not adequately challenge. Further, the district court found that Van Huis, whose duties at [the contractor] included reviewing the RSOs, was "internet savvy." Moreover, Van Huis testified that he understood the notice provision on the RSO and admitted that he could have accessed the terms and conditions on the website at any time. Finally, the district court did not clearly err in concluding that both parties were commercial entities with sophisticated procedures in place for reviewing contracts, even if [the contractor] did not implement those procedures in this case.

*One Beacon*, 648 F.3d at 269. The court also distinguished *Trujillo v. Apple Computer, Inc.*, in which an iphone customer was held not to have reasonable notice of terms of service where the service provider

> offered no evidence that assists in bridging the gap from the theoretical availability of the obsolete version of the terms of service online (along with millions of other websites and documents) to a finding that [the customer] actually had access to it: it has offered no evidence that he was aware of the online version, that he was advised of it, or that, as a reasonable consumer, he should have known of it.

578 F. Supp. 2d 979, 989-90 (N.D. Ill. 2008). The court in *Trujillo* criticized the service provider's "shocking disregard of the requirements of the rules of evidence" when its employee "falsely stated under oath that he had 'personal knowledge' of . . . the online availability of the terms of service." *Id.* at 987-88.

Here, the Court may not rely on Pentagon's hearsay statement that the Terms were available at all times on the NCBFAA website. The standard for reasonable notice under *One Beacon* is not, however, continuous or instant availability, but notice that is "reasonable under the particular facts of this case." 648 F.3d at 268. Online availability was relevant in *One Beacon* because the terms were identified solely by means of an internet address. *Id.* at 269 ("[The contract] referred to a particular document—Crowley's website—containing these terms and conditions"). The district court noted that online access made "business sense" under the facts of the case, "in the shipyard repair industry, where contracts are often negotiated on the deck of vessels or in a shipyard trailer." *One Beacon*, CIVA H-08-2059, 2010 WL 1463451 (S.D. Tex. Apr. 12, 2010), *aff'd and remanded*, 648 F.3d 258 (5th Cir. 2011), at *6. In contrast, Pentagon's reference to the Terms occurred within a stream of email communications during negotiation of the contract. Even if the Terms were not available in three mouse clicks, as Pentagon's employee testified, Tuscany could have easily contacted NCBFAA through their website or emailed or called Pentagon. Like the repair provider in *One Beacon*, Tuscany was a "commercial entit[y] with sophisticated procedures in place for reviewing contracts, even if [it] did not implement those procedures in this case." 648 F.3d at 269; Doc. 54 at 10. Pentagon's contract was at least as

complex as the $316,912 barge repair contract in *One Beacon*, which was documented on a standard order form that the parties had used eight times previously; Pentagon's was a heavily negotiated $2.7 million contract for shipping oil rig components to Brazil and then via 86 trucks to a well site in the jungles of Guyana. *One Beacon*, CIVA H-08-2059, 2010 WL 1463451 (S.D. Tex. Apr. 12, 2010) at *8; Doc. 48-18, 48 at 4; Doc. 54-3. Tuscany's own expert testified Brazilian customs documentation requirements are "well known in the freight forwarding industry" to be "some of the strictest in the world." Doc. 62-1 at 4. Given the nature of its contract, Tuscany may be presumed to have been alerted to possible limitations of liability, more so than a retail iphone purchaser (*Trujillo*) or ship agent making a routine berth application (*Orduna*). Unlike plaintiffs in those cases, Tuscany was notified of a particular document containing limitations, one which has been widely used and cited by courts. *See, e.g., Morgan Home Fashions, Inc. v. UTI, U.S., Inc.*, CIV.A.03-0772 JLL, 2004 WL 1950370 (D.N.J. Feb. 9, 2004) ("[T]he fact that the contractual [exculpatory] provision has been a standard contractual clause approved by the National Customs Brokers and Forwarders Association of America, Inc. and promulgated to its members for some time without manifesting any significant problems provides further evidence that the public at large has not been injured by its use.").

The parties dispute whether Tuscany manifested assent to the Terms, the third element of the incorporation by reference doctrine. *One Beacon*, 648 F.3d at 268. Assent was shown by Tuscany not objecting to the Terms in its response to the email confirming the agreement. *See id.* at 270 ("[Repair provider] manifested assent by accepting the [repair orders] without objection to the terms and conditions."). Tuscany also ratified the Terms by paying the invoices and signing the customs form. *See id.* at 266 ("[The repair provider] ratified their course of dealing by submitting an invoice for the work on the barge without objecting to the terms and conditions.").

Tuscany argues objection was unnecessary because the Terms were mentioned in the signature block of the email, rather than the "text." Doc. 54 at 6. Similarly, the Terms were mentioned in the footer of the letterhead used on the customs form. Doc. 48-12 at 4. There is no caselaw on acceptance of terms in email signature blocks, although businesses frequently add legal disclaimers to email signatures.[3] The enforceability of email signatures is established by statute. 15 U.S.C.A. §§ 7001–7006; Tex. Bus. & Com. Code §322.001 *et seq*. In general, email contracts are interpreted according to ordinary contract law. *One Beacon*, 648 F.3d at 268 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir.2004))). Automatically inserted language, such as the "'hard-coded' or programmed" notice on the repair order in *One Beacon*, is generally valid. *See One Beacon*, CIVA H-08-2059, 2010 WL 1463451 (S.D. Tex. Apr. 12, 2010) at *2. Courts apply the "four corners" doctrine to contracts with multiple parts, including signature blocks. 17A Am. Jur. 2d Contracts § 377 ("It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, including the signatures, must be given meaning, and force and effect."); 11 WILLISTON ON CONTRACTS § 32:5 (4th ed.); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). However, courts may give greater weight to "separately negotiated or added terms," as opposed to "standardized terms or other terms not separately negotiated." RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981); *see Enter. Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (giving greater weight to "operative contractual clauses" than to titles of sections). Terms printed in small letters on the bottom of letterhead or

---

[3] *See* Carolyn Witherspoon, *Confidentiality and Ethics in A Wired World Communication May Be Getting Easier, but Secrets Are Getting Harder to Keep*, PRAC. LITIGATOR, May 2007, at 21 ("There appears to be no case law on enforcement of an email or fax disclaimer."); John Hutchins, *Do Email Disclaimers Really Work?*, TECHNOLOGY FOR LITIGATORS, Feb. 12, 2013 ("There is virtually no scholarly analysis of the impact of email disclaimers and very little analysis by non-scholars."); 4 E-COMMERCE AND INTERNET LAW 59.05[3] (2013-2014 update).

dubious notations beneath signatures are interpreted on a case-by-case basis. 17A Am. Jur. 2d

Contracts § 392.

> The principal question in deciding cases of this kind is essentially the same as that raised in determining whether a parcel claim check, parking garage ticket, or similar document should have terms contained within it given contractual effect: whether the facts present a case where the person receiving the paper should as a reasonable person understand that it contains terms of a contract which the person must read at his or her peril and regard as part of a proposed agreement. . . . [I]f the notice is itself conspicuous or attention is otherwise conspicuously called to it, the language will generally be considered part of the contract. Otherwise, the notice will not form an operative part of the party's agreement.

WILLISTON § 6:48. The Fifth Circuit examined the effect of letterhead in *Anheuser-Busch, Inc. v.*

*Jefferson Distrib. Co.*, 353 F.2d 956 (5th Cir. 1965). The court reversed a jury verdict holding a

brewer liable on a contract where the brewer's correspondence included a printed notice similar

to Pentagon's "All business . . ." notice: "All beer and beverages sold on order-to-order basis. No

contracts, agencies or franchises awarded." *Id.* at 961. The disclaimers were printed at the bottom

of letterhead, beneath the signature *Id.* Similar language was also included in the body of the

correspondence. *Id.* The court explained:

> By commenting on the fact that the letterhead and the order acknowledgment slips used by Anheuser carried the [disclaimers], we do not mean to suggest that this fact, if it stood alone, would as a matter of law foreclose the right of a court to inquire whether the parties really intended for this printed matter to control, *if there had been substantial oral negotiations and discussions dealing with the matter*. This would be a question for the jury to decide. We comment on the presence of this legend, however, only because it was universally used and is fully corroborative of all of the other writings between the parties dealing with the relationship. Time and again, Anheuser and Jefferson, in the body of their correspondence, explicitly stated their understanding of the relationship between the two corporations.

*Id.* (internal citations omitted) (emphasis added). In the context of electronic documents, *One*

*Beacon* cites the seminal case of *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 31 (2d Cir.

2002), which held downloaders of software did not have reasonable notice of terms visible only

by scrolling below the download button, as opposed to terms displayed in "clickwrap" agreements in which users must click "I accept" before proceeding. *Id.*, 23, 22 n. 4, 32–33.

Here, Tuscany admits it never discussed the Terms, much less engaged in "substantial oral negotiations." *Anheuser-Busch*, 353 F.2d at 961; Doc. 54 at 3; Doc. 55 at 11. The Terms were cited clearly within the four corners of the June 1, 2010 email confirmation and prior emails sent during negotiation of the contract. Unlike the terms in *Specht*, the references were not "submerged" on another screen but visible in every email. The references were displayed directly below a similar notice explicitly warning of limitation of liability by carriers, which should alert a reasonable person in Tuscany's position of the existence of terms which he or she "must read at his or her peril." Doc. 48-11 at 19; WILLISTON § 6:48. By replying to the emails, by not objecting, and by paying invoices attached to emails with references to the Terms, Tuscany manifested assent to the Terms.

### B. Express Warranty

Pentagon argues Tuscany has failed to provide summary judgment evidence to support its express warranty claim, including the "who, when and how of the supposed express warranty representations."   Doc. 63 at 2. In its First Amended Complaint, Tuscany alleges 106 representations made by Pentagon in regard to the shipment of the cargo, including Pentagon's ability to anticipate and resolve issues with customs authorities, which are consistent with the correspondence submitted. Doc. 3 at 2-6. Tuscany's express warranty claim, however, is limited by the Terms.

### IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Partial Summary Judgment is **GRANTED**.

Given the limitation of liability upheld by the Court in this order, if Defendant wishes to pursue its third party claims (Doc. 6, Doc. 37), it shall inform the Court within seven days.

SIGNED at Houston, Texas, this 24th day of September, 2014.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE